Danforth v. Moore.

---

WALDO DANFORTH et al., executors of Edward G. Brown, deceased,

*v.*

JAMES MOORE et al.

1. Evidence of a declaration by a tenant in common of property, to a disinterested person, that he was operating it entirely at his own expense, is not sufficient to establish a contract on his part not to make any demand on account of his expenses.

2. In the absence of a contract, the only remedy for a tenant in common, who makes expenditures on the common property, is to have the part improved set aside to him on a partition, or, this being impracticable, to obtain an equitable allowance on sale in lieu of partition.

Danforth v. Moore.

3. Where property held in common is sold pursuant to an agreement of the tenants in common, among themselves, that from the proceeds there shall first be paid to them the respective amounts found to be due to them as debts, and this has reference to expenditures made by them on the property, the agreement will be enforced, but such expenditures will not be considered debts, so as to bear interest from the time they were made up to the time of such agreement.

4. Where an agreement is made by the owners of railroad bonds, the purchasers thereof and the agent negotiating the sale, that one of the owners shall be custodian of them and make *pro rata* delivery thereof to the purchasers, as partial payments in money are made, and pay the agent his commission when a certain amount of the purchase-money is paid, he will be liable to the other owners for making delivery of part of the bonds for a worthless note and for delivering others to the purchasers on their agreement to pay the agent, the purchasers not having then or afterwards paid the amount which entitled the agent to his commission.

5. The loss by reason of such delivery will, in the absence of evidence as to the value of the bonds or any regular market value, be the price put on them in the contract of sale made shortly before; allowance, however, being made for the fact that the remaining bonds, which the purchasers failed to take, were benefited by a necessary expenditure in improving the road, which the purchasers made pursuant to their agreement that they would do so if the bonds should be delivered in consideration of the note.

6. On a sale of railroad bonds, one of the owners was made custodian thereof to make delivery of *pro rata* amounts as partial payments were made. Without authority he delivered some of them for a worthless note. Thereafter, the purchasers having failed to take the remaining bonds, and the road having become insolvent, and there being litigation pending in which the organization of the railroad and validity of the bonds were attacked, the other owners proposed a sale of them for a certain amount, and he agreed to a sale at any price, "provided, however, I am forever thereafter relieved from any further responsibility or liability in any way relative to said railroad or the securities thereof."—*Held*, that this did not have reference to or include his liability to the other owners for this unauthorized delivery of bonds.

On bill for accounting &c. Heard on bill, answers, replications and proofs.

*Mr. James R. English* and *Mr. A. S. Brown* (of the New York bar), for the complainants.

*Mr. Frank Bergen*, for the defendants.

EMERY, V. C.

The bill in this case was filed by the complainants, as executors of Edward G. Brown, one of three tenants in common, against James Moore and John Kean, the other two tenants in common, and John Kean having died after answer filed, the suit has been continued against his executors by an order of revivor. The common property was sold previous to the filing of the bill, under an agreement in writing made between the complainants and Moore and Kean, and the proceeds of the sale have, by virtue of the agreement, been paid over to John Kean, Jr., as trustee, who is also made party defendant in that capacity. The object of the bill is twofold—first, to recover for the complainants the disbursements which were made by Edward G. Brown, in his lifetime, for the repairs and improvements made upon the common property, and in managing the property, with interest thereon, payment of these sums being claimed before any division of the proceeds of sale among the tenants in common or their representatives, and second, to charge the defendant James Moore, one of the tenants in common, with the amount of two notes, aggregating $12,000, which were taken by him as part. of the proceeds of sale, and which turned out to be worthless, and also to charge him with a certain other payment or allowance of $1,500 made by him. For these amounts the complainants claim that Moore is accountable under the agreement of sale.

So far as relates to the claim for contribution or reimbursement of the expenditures made by the deceased tenant in common, the facts established by the pleadings and proofs are as follows :

[Here follows a statement of facts.]

The case must therefore be treated as one in which the disbursements were made by one tenant in common, without any contract in relation to them on either side, and the rights of the parties are to be determined upon the rules applicable to tenants in common, except so far as these rights are modified by the agreement for sale and division of the proceeds.

The right of the complainants to recover their proportion of

these expenditures made by Brown from the other tenants in common cannot, it seems to me, be based on the first ground alone, for the rule is clear, both at law and in equity, that in the absence of a contract to pay, either express or implied, on the part of the co-tenants, no remedy exists for money expended in repairs or improvements by one tenant in common so long as the property is enjoyed in common. *Leigh* v. *Dickeson, 15 Q. B. Div. 60, 67; Farrington* v. *Forrester, 2 Ch. Div. 461, 478 (1893); Freem. Co-ten. & P.* ¶¶ *261, 262.*

In such cases where necessary repairs and improvements have been made in good faith by one tenant in common, but without any contract or agreement for repayment or contribution, the only remedy of the tenant who has made the disbursements is in the court of equity, where, on a partition or sale of the common property, an equitable adjustment is made to the tenant, either by assigning to him the part of the property which he has improved in good faith or, where such partition is impracticable and the property is sold at an increased value by reason of the repairs or improvements, by making an equitable allowance for what has been expended in order to obtain this increased value.

The former course was followed in *Hall* v. *Piddock, 6 C. E. Gr. 311; Doughaday* v. *Crowell, 3 Stock. 201; Brookfield* v. *Williams, 1 Gr. Ch. 341; Obert* v. *Obert, 1 Hal. Ch. 397.*

Lord-Justice Cotton, in *Leigh* v. *Dickeson, supra* (at *p. 67*), says : " No remedy exists for money expended in repairs by one tenant in common so long as the property is enjoyed in common, but in a suit for partition it is usual to have an inquiry as to those expenses, of which nothing could be recovered so long as the parties enjoyed their property in common. When it is desired to put an end to that state of things [the ownership in common] it is then necessary to consider what has been expended on improvements and repairs; and whether the property is divided or sold by the decree of the court, one party cannot take the increase in value without making an allowance for what has been expended in order to obtain that increased value; in fact, the execution of the repairs and improvements is adopted and sanctioned by accepting the increased value. There is,

Danforth *v.* Moore.

therefore, a mode by which money expended by one tenant in common for repairs can be recovered, but the procedure is confined to suits for partition."

Brett, M. R. (at *p. 65*), also says: "The only remedy which exists, either at law or in equity, is when the rights of the tenants in common go into chancery on suits for partition or sale. If the law were otherwise, a part owner might be compelled to incur expense against his will. The refusal of one co-tenant to bear any part of the cost may be unreasonable; nevertheless, the law allows him to refuse, and no action will lie against him." See, also, cases cited in *29 L. R. A. 452, notes.*

The cases in our own courts above referred to, which are relied on by complainant, are not authority for the recovery of a proportionate share of the advances made by Brown, as of a debt due to him, for so much money, but only for an equitable partition of premises which have been improved by one tenant in common.

And, if the complainant's right of recovery is to be put upon the basis of a debt or claim for which Brown had the right of recovery at once, either at law or in equity, it is difficult to see why the claim is not barred by laches. The claim, on this basis, was due not later than July, 1872, while the bill in this case was not filed until September, 1893, and the debt, not being due by contract under seal, was by analogy with the statute of limitations and upon the ground of laches barred before Brown's death. After this delay, and in the absence of any express contract, or of circumstances from which a contract for reimbursement can be implied, the complainants' right to recover must be based on their equities as representing the deceased tenant in common, and succeeding to such rights, modified as they were by the agreement for sale. Independent of this agreement for sale, the equity of the complainants was to have such equitable allowance made on a sale of the property as would, out of the increased value of the property derived from Brown's expenditures for improvements, reimburse him to the extent of his advances, in connection with Kean's. But the common property having been sold by agreement of the parties, without application to any court

Danforth *v.* Moore.

for partition or sale either in New York, where the property was located, or in New Jersey, the domicile of the owners, it has been rendered impracticable to adjust the equities on this basis. And in making the sale, under this agreement, the parties have treated the advances made by Brown, if recoverable at all, as the personal property of Brown's estate, whereas, for all the expenditures which relate to the real estate, the heirs-at-law or the devisees of the tenant in common and not his executors as such, are the successors to the rights of the deceased tenant in common and entitled to the allowance for improvements on the real estate. So that, in the present case, the defendants and the complainants, by selling all the property as common property, owned as such by themselves and themselves only, have pursued a course which has made the usual course of inqury either *impracticable* or *altogether* unsatisfactory. It would be difficult, if not impossible, to ascertain now, by a reference, what increased value, at the time of the sale in 1887, existed in the property, both real and personal, by reason of the repairs and improvements made by Brown in 1871 and the years following up to 1880, and to ascertain further what proportion of this increase was due to the complainants, as succeeding to the personal estate of Brown. And, if the rights of the parties to this suit were to be settled purely on the basis of the rules of equitable allowance, for the increased value the fairest rule to be applied, on the evidence in this case, would be, as it seems to me, to treat the advances made by Brown and Kean as additions to the cost of the road, and to treat them as adding their proportion along with the original cost, to the value at the time of the sale.

This seems to have been the basis on which the statement of September 30th, 1879, was made up, the original cost and the additional expenditures each being put on the same basis as to interest. This would increase the proportion of Brown and Kean, in the proceeds of sale, over their original three-eighths, until the balances due for advances were repaid. But in view of the express provisions as to the disposition of the purchase-money, made by the agreement of sale, and of the radical changes which that agreement made in the equitable *status* of Brown's

Danforth *v.* Moore.

estate, and especially of his personal representatives, I do not consider that I have the right to remit the complainants to what would have been their strict equitable rights, if a court of equity had ordered a sale. The complainants, as Brown's executors, succeeded certainly to his rights in all the personal assets conveyed, including choses in action accounts &c., and by reason of Brown's original ownership of all the personal property purchased by him, and which does not seem ever to have been conveyed to the other co-tenants, had, perhaps, exclusive ownership (at least in equity) of all the valuable personal property which replaced his original purchases. When, therefore, the defendants, desiring to convey the whole property, real, personal and choses in action, as one common property, procured the complainants to join in the sale, and thus change altogether their existing equitable *status*, it was entirely competent for the parties to treat the property as a common property in its then existing state, without reference to the proportionate value to it by Brown's repairs and improvements, and to provide, by their agreement, for another method of protecting Brown's right to reimbursement for his advances.

In my judgment, and as I construe this agreement, the parties have made this change in the *status* existing at the time of the sale, and have, by this agreement and for the purposes of dividing the proceeds, agreed to treat the advances made by all of the co-tenants as debts to be first paid out of the proceeds of sale.

The advances made by Moore and Kean, after the death of Brown and before the agreement, were, so far as appears, of precisely the same nature as those made by Brown, and have no higher equity. These advances by Moore and Kean, equally with those made by Brown—when the latter were judicially determined—are treated, for the purposes of the agreement and division, as debts, the language of the agreement being, the trustee "shall pay to John Kean, James Moore and the executors of Edward G. Brown, the respective amounts found to be due to them as debts" &c.

For the purposes of this division, the parties treated advances made by either tenant in common as a debt, and not merely as

a claim for equitable allowance, based on benefits actually conferred on the property. As the parties were competent to deal with the proceeds on any basis they chose, a court of equity should carry out the settlement on the basis of the advances provided for them in the agreement, especially in view of the fact that the agreement and sale thereunder has made it impossible to adjust the rights of the parties on their original equitable basis. In reference to this claim for reimbursement, therefore, I conclude that the complainants and Kean are to be first repaid out of the funds remaining in the hands of the trustee, the balances due them respectively for their advances prior to Brown's death. This allowance, however, will be made only on the principal of the claims, with interest thereon from the time of filing the bill. The agreement makes no express provision in regard to the interest, and the mere characterization of these advances as "debts," in the agreement for division of the proceeds of sale, will not so change their nature as to make them debts payable when the advances were made, and with interest from that time. The advances, as I have above said, cannot be treated as debts of this character, for then both principal and interest would be barred by the Brown laches.

Complainants claim interest at least from 1885, the time when, as defendants' answers admit, Brown notified them of his advances, and that he would ask payment out of the proceeds of sale, but the defendants also state that at the time of the notice they denied his right to reimbursement, and that Brown agreed they should be paid only after the original cost had been repaid. These admissions are not sufficient to charge them with interest from that date, nor, in view of the agreement of sale and its effects on the equitable rights of the parties, do I see any basis of allowing interest on any debt for advances payable to complainants under this agreement until demand made for it, under the agreement which, in this case, was by filing the bill in this cause.

The second question in the cause relates to the right of the complainants, under the agreement of sale, to charge the defendant with certain notes of A. W. Beasley & Co., one for $4,000

and one for $8,000, and an allowance to them of $1,500 for commissions to the agent who effected the sale, the claim being that Moore received and allowed these in violation of the agreement, which provided that cash should be paid and that the commissions were not payable until the whole purchase price was paid. Moore, in his answer alleges that the notes were taken and the allowance of the $1,500 made with the consent of the complainants, and it is claimed by his counsel that the proofs establish that the $4,000 note and the $1,500 allowance for commissions were made by the verbal authority of the complainant Ryder, one of the executors, and that the $8,000 note was taken by authority of Danforth, the other complainant executor.

[Here follows a statement of the facts in relation to these claims.]

In view of these facts and evidence, I think the defendant Moore has sufficiently established, by the weight of evidence, that the delivery of bonds for the $4,000 of notes instead of cash, was by the authority of Mr. Ryder.

But this authority, given by Ryder to Moore, as testified to by the latter, to make the best bargain he could, was no authority to deliver any bonds without any payment, either in cash or in notes, by the Beasleys, under the agreement, or to deliver any bonds to the Beasleys by way of payment or allowance for the commissions of Thomas Moore, which were not due or to be paid until the whole $50,000 was paid.

Even admitting that Ryder, as one of the executors, had authority to bind the estate by authorizing such an allowance to be made, it should certainly appear satisfactorily that he specially authorized it to be made, and that he did so with as much knowledge of the relations between Thomas Moore and the Beasleys as the defendant James Moore could have communicated to him before making this allowance for unearned commissions. As to so many of the bonds, therefore, as were to be delivered to the Beasleys for this $1,500, the defendant must be held to account.

On April 20th, 1888, the defendant Moore made another

delivery of ten bonds and thirty shares of stock to the Beasleys, this delivery being made without receiving any cash at all from them, but receiving their note at ninety days, for $8,000, they also agreeing to expend that amount in betterments and repairs on the road.

[Here follows statement of facts in reference to this delivery.]

I conclude, therefore, upon this second branch of the case, that it is sufficiently established that the defendant Moore, in violation of the complainants' rights, under the agreement, delivered bonds and stock for the $1,500, on the second installment, and the $8,000 on the third installment, without receiving the cash therefor, and, as the notes are admitted to be valueless, is responsible to the complainants for the loss they have sustained from such violation, unless the further claim of the defendant that he was afterwards released from this liability is sustained. This question arises as follows: After the default of the Beasleys in their purchase, in 1888, the vendors retained the remaining stock and bonds along with the control of the road, which soon after became involved in litigations arising out of foreclosure of the mortgage and other claims, and a receiver or receivers of the road were appointed.

The sale of the bonds and stock of the Belt Line road still remaining in Moore's hands for the common benefit was made in April, 1892, on the proposition of Mr. Ryder, contained in the following letter:

"ELIZABETH, N. J., April 1st, 1892.

"*James Moore:*

"There is a remote prospect of getting $10,000 for the Bonds of the S. I. B. L. R. R. if we can all agree to it. Are you willing to accept that amt.? It is that or nothing. If we accept it will end all further litigation. Please let me know right away and if you think favorably appoint a time and place to meet now.

"S. B. RYDER."

Mr. Moore mailed a reply to this letter, of which reply a duplicate or copy was retained by him, and was put in evidence after a call for the original letter, which was not procured. Mr. Ryder, being afterwards examined, did not, however, deny the receipt of the letter.

The reply was as follows:

"ELIZABETH, N. J., April 1st, 1892.

*"Seth B. Ryder:*

"DEAR SIR—Yours of this date is rec'd informing me 'that there is a remote prospect of getting $10,000 for the Bonds of the S. I. B. L. R. R. if we can all agree to it' &c.  In answer I say that I will agree to that or any other sum that the parties in interest will agree to. *Provided* however that I am forever thereafter relieved from any further *Responsibility* or *Liability* in any way relative to said Rail Road or the securities thereof.  I directed Mr. R. C. Swan of 115 B. Way, N. Y. to call upon you with English the other day to consult about the sale of the road, and informed him that I would agree to any arrangement that the Estate of Brown & Col. Kean would agree to.

"If well enough I will call at your office on Monday next A. M.

"Yours truly,

"JAMES MOORE."

The bonds and stock were soon afterwards sold by the owners for $10,000—$5,000 in cash and $5,000 in notes, with security— and delivered by Mr. Moore pursuant to this offer referred to. It is now claimed that this sale being made upon the condition specified in Mr. Moore's letter, he is relieved from all previous liability as trustee or custodian under the agreement, and at the hearing, before the examination of Mr. Moore, an amendment was permitted to be made to his answer setting up this defence. At the time of the letter, it is shown that several litigations were pending against the Belt Line company, and that in some or one of them the organization of the railroad and the validity of the bonds held by the owners were attacked.   This was undoubtedly the litigation referred to in Ryder's letter, and reading Ryder's letter in connection with Moore's reply, I do not think that the provision in the latter that Moore "was to be forever thereafter relieved from any further responsibility or liability in any way relative to said railroad or the securities thereof" can fairly be construed as covering or intended to reach to Moore's liability as trustee or custodian under the agreement of September 1st, 1887, for previous violations of its provisions made while it was in force.   If Moore intended it to be used for that purpose, this intention should have been specially called to his *cestui que trust's* attention.

The court scrutinizes closely releases from a *cestui que trust* to

a trustee, and the *cestui que trust* must have full knowledge of the circumstances of the case. *2 Perry Trusts § 851.* This would include, I think, knowledge of the purpose for which the release was to be used in relation to the breach of trust.

No consideration appears for the release from any previous liability as trustee, because Moore says in the letter that he is willing to sell the bonds and stock for the $10,000 *or any other sum* the other parties would agreed to, and if a release had been actually intended to be executed by the complainants, on the terms of Moore's letter, it is doubtful whether a court of equity would have required its execution by them, if intended to cover the previous default as trustee, which was not expressly called to the attention of the parties. And inasmuch as no release has actually been executed, and the whole defence upon this point rests on the basis of equitable estoppel, the provision or condition in the letter should, in equity, be applied to the responsibilities and liabilities of Moore, which were evidently in the minds of *both* parties, and should not be construed to protect him against liabilities for breach of duty as trustee under the agreement, as to which no litigation had then been commenced. I conclude, therefore, that the question of Moore's liability in this suit, based on the agreement, is unaffected by this correspondence or action under it.

The defendant being, then, liable to make good to complainants their loss by reason of the wrongful delivery of the bonds, the next question is as to the amount of the loss with which he is to be charged. This depends upon the value of the bonds at the time of their delivery, but what this value was it is difficult to determine satisfactorily from the evidence. *Prima facie,* as it seems to me, the bonds must be, as against the defendant, who offers no proof of their values, taken as worth the amount which the vendors would have realized for them under the agreement, *i. e.,* $50,000, less $5,000 commission for the whole $100,000 in bonds, or at the rate of forty-five per cent. of the par value. The Beasleys sold some of the first and second installments of bonds at about ninety, but there was no regular market value, and it would not be just to take these special sales, the circum-

,stances of which are not known, as the basis of the loss which the complainants sustained by Moore's improper delivery of the bonds to the Beasleys. Nor, on the other hand, can the sale of the remaining bonds and stock made by the parties four years later, and after the new company had failed and the road was in the hands of a receiver, and while numerous litigations were in progress, be taken as a standard for proving the value in 1888, when the road, although not in good condition, was free from debt. In the absence of direct evidence as to value, it seems to me that the sum fixed on near the time by all the parties as their value, may fairly be taken as *prima facie* the basis from which to establish the amount of loss. It must be borne in mind, however, that it has been shown that at the time of the delivery of these bonds the road was in bad repair, and that by reason of its condition the Beasleys found it difficult or impracticable to dispose of more bonds; that this need of expenditures for improvements was one reason given by them for their lack of funds to pay for the bonds, and that upon giving the notes for $4,000 and $8,000 they agreed to expend these amounts in improvements on the road, which seems to have been treated by the vendors as under the control of the Beasleys for this purpose at least. These moneys are proved to have been expended by the Beasleys upon the road pursuant to their agreement, and therefore to the extent of this expenditure the vendors, as holders of the remaining bonds, and by reason of the delivery to the Beasleys, have been benefited along with the other bondholders by having the security still held bettered to that extent. This expenditure and benefit must therefore also be taken into account in estimating their loss by reason of the delivery of the bonds, and in order to arrive at the allowance which should be made for this, I can see no more fair or equitable method than to treat this amount as really expended, or necessary to be expended, by the vendors upon the road in order to realize upon the remainder of their securities. Deducting, then, the $12,000 from the total sum of $45,000 which was to be realized, the bonds would stand as worth thirty-three per cent. This is the best estimate I can form on the evidence submitted. I omit all

reference to the stock in estimating the values, for the reason that this being a road whose stock did not have any selling price in the market, it was in fact worth little or nothing unless the bonds were worth par.

The defendant Moore, on this basis, would be chargeable, in favor of the complainants, with bonds to the par value of $1,875, being the proportionate amount to which the $1,500 allowance was entitled on the second installment, and with bonds to the par value of $10,000 on the third installment. At thirty-three per cent. of their face value the charge would therefore be of $718.75 on the delivery of February 20th, 1887, and $3,300 on the delivery of April 20th, 1887.ˈ This charge, however, in taking the accounts, is to be made only in favor of the complainants and not in favor of the defendant John Kean or his representatives. In his answer this defendant makes no claim that Moore's action in the matter was without his authority or consent, and Moore, in his evidence, called as a witness for the defendants, states that he had absolute *carte blanche* authority from John Kean to deal with the Beasleys under the contract.

The accounting, therefore, will be upon the basis that, in favor of the complainants, the defendant James Moore will be chargeable with three-eighths of the above amounts—$718.75 and $3,300—and with so much more thereof as may be necessary to reimburse the trust fund sufficiently to pay to the complainants the amount which they are entitled to receive for the advances made by Brown in his lifetime and allowed them, with interest.

The accounts of the trustee John Kean, Jr., not being disputed in any respect, the final decree can be made on the evidence already in, unless either party applies for a reference to a master to state the account in conformity with this opinion.